IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 3, 2011 Session

JANICE W. WINKLER
v.
CHARLES S. WINKLER

Appeal from the Chancery Court of Rutherford County
No. 09-0951DR    Royce Taylor, Judge

No. M2010-01821-COA-R3-CV - Filed October 25, 2011

This is a divorce case. The parties had a long marriage and one minor child. The wife obtained an order of protection against the husband on behalf of herself and the child and filed for divorce. After a trial, the trial court granted the wife a divorce, extended the order of protection against the husband, and divided the marital assets. The trial court did not award the husband parenting time, and required the husband to attend anger management classes and pay child support. The wife was awarded the marital home subject to a lien in favor of the husband. The husband appeals the child support and the failure to award him parenting time. The wife appeals the trial court's award of a lien on the parties' marital residence in favor of the husband. We affirm as to parenting time and child support, and reverse as to the lien on the marital residence.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of Chancery Court Affirmed in
Part; Reversed in Part and Remanded.

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

Charles G. Blackard, III, Franklin, Tennessee, for Defendant/Appellant Charles S. Winkler.[1]

David W. Garrett and Jacob T. Thorington, Franklin, Tennessee for Plaintiff/Appellee Janice W. Winkler.

---

[1] The appellant was represented by different counsel in the trial court below.

# OPINION

## FACTS AND PROCEEDINGS BELOW

Plaintiff/Appellee Janice W. Winkler ("Mother") and Defendant/Appellant Charles S. Winkler ("Father") were married for approximately twenty-one years. Father has an associate's degree. Mother has a high school education and worked in banking. In 1994, Mother gave birth to the parties' son ("Son"). After the birth of Son, Mother became a stay-at-home parent.

Father's work during much of the parties' marriage is somewhat unclear from the record. At some point, he became self-employed doing repair services on banking machines. In 2005, his income from this business dropped substantially. Father then took truck driving courses and obtained a commercial truck driver's license, with several specialty endorsements such as for hauling hazardous materials. Once licensed, Father did long haul truck driving for a while. At some point, he obtained a truck driving position that involved only local hauling.

In approximately September 2008, Mother began working part-time, again in banking. In May 2009, Father lost his truck driving position doing local hauling. He did not want to return to long-haul driving, so he began drawing unemployment benefits.[2] Shortly after that, in June 2009, Mother secured a full-time job in banking.

By any measure, much of the parties' marriage was unhappy. Father often perceived Mother's actions as contrary to his authority as head of the household. Father regularly called Mother a "bitch," and referred to her as such to persons who telephoned the parties' home.[3] Father called Son similar names, such as "S.O.B." He shot at neighbors' pets with his BB gun. Father's pickup truck had "KKK" sanded into the hood of the vehicle, and he kept in the home compact discs containing songs with racially offensive lyrics. To the extent that Father became involved in Son's activities, there were conflicts, such as Father's removal as the coach of Son's soccer team, and wrestling or sparring with Son in a manner that was intended to "show him who's boss."

The parties' conflicts came to a head on June 2, 2009. On that day, Mother and Son returned home from Son's football practice to find Father in the family garage. A conflict erupted

---

[2]The extent to which Father continued his side business of repairing banking machines is unclear from the record.

[3]Father maintained that Mother called him names as well.

over whether Father was removing items that belonged to Mother and Son. After a heated exchange, the conflict became physical and Father hit Mother and Son.[4] That day, Mother and Son left the family home.

After that, Mother filed domestic assault charges against Father and obtained an order of protection. Father was arrested and enjoined from returning to the marital home or contacting Mother and Son. On June 29, 2009, Mother filed a complaint for divorce in the Chancery Court of Rutherford County, Tennessee.[5] Father counterclaimed for divorce, and sought joint custody of Son. Discovery ensued. Father obtained counseling and attended parenting classes during the pendency of the divorce. Father did not have parenting time while the proceedings were pending, and the order of protection remained in effect.

The trial was held over two separate days, on April 15, 2010, and May 3, 2010.[6] Mother testified at the outset. She described the incident on June 2, 2009 that prompted her to seek an order of protection. On that day, she said, she and Son (then 14 years old) returned home from Son's football practice to find Father removing their belongings from the family's garage. When Mother and Son asked him to stop, Father refused. Mother became upset and called Father a bully and a "fag." Father responded by calling her profane names repeatedly and then hit her on the face, twice.

Mother testified that Son then told Father to stop or he would call the police. Father responded by saying "I dare you, you little S.O.B." and began chasing Son. In the ensuing fracas, Mother said, Father struck Son and Son fell to his knees. Mother and Son then went into the house. Father came inside and told Son, "you get what you deserve if you get involved." When Father went to the bathroom, Mother and Son grabbed some belongings and left. Mother then obtained the order of protection.

Mother described the parties' marriage preceding the June 2, 2009 incident. Particularly after the birth of Son, she said, Father was controlling, angry, abusive, and demeaning to her and to Son. Mother claimed Father routinely referred to her as a "bitch," often in front of Son

---

[4]Mother alleged that Father hit her on the face twice. Father did not deny hitting her, but claimed he did not recall whether he did. Father claimed that he hit Son in the course of defending himself.

[5]The order of protection was obtained under a separate case number and was later consolidated with the divorce.

[6]At the outset, the trial court held an evidentiary hearing on whether Father violated the order of protection by sending Son a letter and various Christmas gifts. The trial court determined that there was no violation of the order.

and others, and that he tried to isolate her from her friends. Father sometimes put a screen saver on the family computer that read "Your Mamma's a Bitch." Mother was required to obtain Father's approval before making any purchases, including groceries or gas; if she failed to do so, Father would become angry and take away her debit card. She testified that Father, when angered, broke household items, chased Mother through the house, and knocked her down, all in front of Son. When Son said he would call the police, Father responded by pulling the phone cord out of the wall. She recounted that Father regularly shot at neighbors' pets with a BB gun, and threatened a neighborhood party with a shotgun. Father frequently used racial slurs in Son's presence and elsewhere, answered the home telephone with racial insults, used a racial slur as the password for the home computer, and sanded the words "KKK" onto the hood of his truck. Mother claimed that Father would stay out late drinking, and would come home even more verbally abusive.

Mother described Father's unhealthy relationship with Son. She said that Son is a straight "A" student, active in sports, and has never had disciplinary problems. Despite this, Father regularly called Son various derogatory names, and viewed pornography in Son's presence. Father would make noises and distractions to interfere while Son was trying to study at home, to the point that Mother and Son would leave the house so Son could study. Father seldom attended Son's football games, ostensibly because he objected to having to pay to attend.[7] The only activity of Son in which Father participated was martial arts. Mother testified that when Father brought Son to the martial arts classes, Father would "engage" with the mother of two other students during the class time period and after the class, which made Son uncomfortable. In addition, Father would "spar" with Son, then eight years old, and knock him down to "make him tougher."[8] Overall, Mother expressed concern about Son visiting with Father at all.

Mother testified at length about the parties' assets, debts, and finances. She asserted that the value of the marital home in Murfreesboro was approximately $200,000, based on an appraisal she obtained.[9] She said that there was no debt on the marital home. Mother explained that, in 1998, a friend of Mother's from her banking work gave her two checks totaling $120,000. Mother said that these monies were used to pay off the debt on the marital home, and to pay for improvements to the home, including an addition for a nursery for Son.

_____

[7]At some home football games, Father would attend if Mother could get him in for free by moving chains, presumably the first down chains on field.

[8]Father testified that he is 6'2" and 270 pounds.

[9]Mother's appraiser testified at trial.

Son also testified at trial.[10]  His testimony largely corroborated Mother's testimony, but provided more detail on his relationship with Father.  At the time of his testimony, Son was fifteen years old and a freshman in high school.  He testified that he had a 4.0 GPA,[11] was interested in film, played golf, and was on the school's football team, and that it was very important to him that he try his best to succeed.

Son corroborated Mother's description of the incident on June 2, 2009.  Specifically, he said, Father struck Mother in the face twice, and when Son said he would call the police, Father chased him and hit him in the back of his head.  Afterward, when Father went to the bathroom, Mother and Son left.

Overall, Son said, Father routinely made derogatory comments toward Mother, often calling her "the 'B' word."  He had seen Father get upset over trivial matters and chase Mother, hit her, and threaten to kill her, and had witnessed Father often come home drunk and abusive.

Son said that Father was not supportive of his schoolwork or his ambition.  Father did not help Son with his schoolwork, and, in fact, frequently created disruptions and distractions during the time Son was working on homework, to such an extent that Mother would take Son to the library to work on his homework.  Son stated that Father's behavior of shooting the neighbor's pets with a BB gun "ended the relationship" with the neighbors.  Son testified that Father made racist comments around the home and while answering the phone, and called Son by names that were racial slurs.  Father told Son that he wanted to join the KKK, and would research the organization on the family computer in Son's presence.  Son described Father getting out of the car to confront a driver who was following too closely.  Son said that Father's conduct was embarrassing and made him feel unsafe.

 Son related Father's advice to him concerning women:   practice the "3 F's"- find, f_ _ _ , and forget.  He said that Father was unsupportive of his sports – questioned why he needed to play an expensive sport such as golf, would not attend Son's football games if he had to pay, and used Son's martial arts lessons to engage with another parent, a woman named "Sugar."  Even after the separation, Son said, Father sent him a bag of coal as a Christmas present, along with a letter that implied that Son had lied.  Son said that he did not want to see Father, and stated:   "I feel he can put my life in danger and can hurt me."  He described their home life since Father had been gone as "peaceful" and "relaxed" and "safer."

_____

[10]Son testified out of the presence of the parties, but in the presence of their lawyers and the trial judge.

[11]"GPA" stands for grade point average.

When Father's counsel questioned Son, he prefaced his questions by relating to Son that Father had taken anger management classes, had had counseling, and had offered for him and Son to do counseling together "to rebuild their relationship." Father's counsel then challenged Son's view of his relationship with Father and pressed him to consider visitation with Father. Son rebuffed the attorney's attempts to show that Father had been a good father and explained that he did not think that joint counseling and visitation "would be a wise thing to do, because of the position . . . that he has put me in, and how much better my life has been without him." Father's attorney noted that Father's Christmas letter to Son had said that he loves Son, prompting the following exchange:

Q:     And in that [Christmas] letter [Father] put that he loved you?
A:     Yes. I don't know that I believe that.
Q:     Well, what's wrong with trying to find out if –
A:     Love is a word.
Q:     Right.
A:     Have you ever heard, actions speak more than words?
Q:     I sure have.
A:     Do you believe in that?
Q:     Absolutely.
A:     Because I do.
Q:     Absolutely.
A:     And his actions over the . . . time that I have been young have been difficult. I have tried to have a relationship with him. I don't see that working. And I just feel . . . I would succeed better without him.

Son rejected the idea that Father had changed by attending anger management classes and counseling. He said, "I don't believe [Father] has learned anything from those courses," noting that Father had promised changes in the past and never did.

Father's testimony differed greatly from that of Mother and Son. He related the incident on June 2, 2009 from his perspective. At the outset, Father characterized the incident as "basically a set-up by my wife," that Mother allegedly planned in advance. Father said he was cleaning out the garage when Mother and Son came home and Mother purposefully provoked him by cursing at him, belittling him, and telling him what he could and could not do. After he asked her to leave, Father said, Mother continued to antagonize him and "undermine[] my authority." He said that Mother "was stirring [Son] up against me," until Son told Father not to move Son's belongings. Father recounted: "I said, son, it's on my side of the garage. This is my house. I'm the man of the house. I can [do] what I want to do."

Son ran, and then Mother and Son confronted Father, "being disrespectful." Son initially ran from him again, Father said, and then returned and tried to "punch" Father in the face. Father described:

> I blocked his punch and slapped him in his mouth, open hand, in a controlled fashion, and told him he was not going to attack me, he should know better than to attack me, we had been studying martial arts together for years as father and son, and that that was inappropriate.

Father maintained that he "back-fisted" Son in the face only to defend himself. Father would not deny that he hit Mother in the face during this incident, but would say only that he did not recall if he did. He explained:

> I'm saying I tried to contain and diffuse a hostile situation that [was] perpetrated against me. And as head of the household I tried to assert my authority and diffuse and contain that situation. And they [] both [were] silly to try to physically dominate and run over me, and they did not, sir.

After Mother and Son went into the house, Father said, he went in to "check on them, . . . and have a family discussion regarding the incidents and the issues of disrespect and so forth." Another conflict arose regarding Son's computer, Father claimed, and Mother said, "We're leaving," and she and Son left. That evening, Father said, he was arrested for domestic assault. Since then, Father testified, he had seen Son only in court.

Father described the family dynamic prior to the June 2, 2009 incident from a similar vantage point. He claimed that Mother would often "yell," "cuss," and "belittle" Father, and would seek to "undermine [his] authority." Father said that he changed the address on a joint financial account to his parents' address because Mother "was undermining me with the mail." He monitored Mother's expenses such as gas purchases because she "would frequently undermine my authority and take money out of our account with regard to paying bills."

Father stated that he was not currently employed, and testified that his only income was unemployment benefits. He said that he had a commercial truck driver's license with special endorsements, such as for hazardous materials. He had done long haul driving in the past, and his most recent employment was doing local runs. When Father's job doing local runs ended in May 2009, Father said, he did not want to accept a position doing long haul driving that required overnight stays on the road. Father claimed that he had applied for and sought other employment with no success. Father conceded that he still had his own "side" business

repairing banking machines but claimed that he could not operate the business because Mother had prevented him from having access to his records, equipment, supplies and parts. He said that several "friends" had taken care of the banking machine repair business that was left, but Father received no monies from it.[12]

Father also testified that he had made significant renovations and improvements to the parties' marital home. He said that his grandfather paid for the subfloor materials for the home. He offered his lay opinion that the value of the home was between $275,000 to $300,000. Father asserted that the marital home should be sold and the proceeds be split equally between the parties.

Father did not "recall" requiring Mother to receive his approval before purchasing gas and groceries. He admitted he at times referred to Mother as "bitch," and conceded that he "may have" written "Your Mamma's a Bitch" as the screen saver on the family's computer screen. He also admitted that he had sometimes referred to Son as an "S.O.B." Father acknowledged that when certain persons called the home and asked to speak to Mother, he would tell them that "the bitch isn't here." He allowed that he had "shot a few cats and a few dogs with a b-b gun" in order to train them not to come into his yard. Father testified that "[s]omebody" sanded the words "KKK" on the hood of his vehicle, adding that he was "not aware" that he had done it. Father acknowledged that he "may have" a compact disc containing songs with racially offensive lyrics, and identified his handwriting on the CD. Father denied that he refused to attend Son's football games, but said that he did not think that parents should have to pay to see their children's sports games. When questioned about a blue vehicle regularly seen in the carport of the home he rented after the parties' separation, Father professed to not know to whom the car belonged, adding, "People come by. I have visits from Jehovah's Witnesses and other people come by."

Since the parties' separation, Father testified, he had undergone counseling and had attended eight weeks of anger management classes. Father said that he believed that Son had been "coerced" into taking the position that he wanted no contact with Father. He said that he wanted to have counseling and work on their relationship, with the following proviso:

> I do have concerns. I'm amenable to this counseling; however, I feel that my parental rights have been violated through this process in that the incident that started with my son, as a father, I have as much right to discipline my son – I would like to think I have as much right to discipline my son as my wife does.

---

[12]Father did not explain how his "friends" could service the banking machines in the absence of records and equipment and such, but Father was unable to service them.

And we seem to be conflicted in that, because she seems to think she's the only one that should discipline our son. She has been a lot harder on him in the past and struck him in the face several times a lot harder than I ever did. I would wrestle with him and jump him like a father and show him who's boss but not, you know, anything else like that.

Provided those concerns were resolved favorably, Father said, he was proposing a parenting plan in which he had joint custody and parenting time with Son every other weekend. At the conclusion of the testimony, the trial court briefly took the matter under advisement.

On May 3, 2010, the trial court issued an oral ruling, and the court's oral ruling was later filed. The final decree of divorce was entered on July 26, 2010.

In the final decree, the trial court awarded the divorce to Mother based on Father's inappropriate marital conduct. It found that Father was not a credible witness and specifically credited the testimony of Mother and Son. The trial court stated:

> The Court finds that [Father] needs to be engaged in anger management and also to understand his control issues. The Court finds that most of the factors in the circle of violence from the domestic abuse intervention project have been present in this marriage, including: intimidation, smashing things, destroying property, abusing pets, displaying weapons, emotional abuse, putting [Mother] down, mak[ing] her feel bad about herself, calling her names, making her think she is crazy, playing mind games, alienating her, making her feel guilty, isolation, controlling what she does, who she sees, who she talks to, what she reads, where she goes, limiting her outside involvement, minimizing, denying blame, making light of abuse, not taking her concerns seriously, saying the abuse didn't happen, shifting responsibility for abusive behavior, using male privilege, treating her like a servant, making all the big decisions, acting like master of the castle, being the one to define men and women's roles, using economic abuse, making her ask for money. Based upon the testimony regarding the protective order and the divorce, [Father] must attend a 26 week course that deals with anger management and with power and control cycle.

The trial court extended the order of protection for a year. Upon completion of the 26-week anger management course, it held, Father would be permitted to write letters to Son; in the meantime, there was to be no other form of communication. Mother was to encourage Son to respond in writing. After a year, the trial court held, Father could return to court to seek

parenting time. Until then, the trial court held, "[b]ased on the Court's finding of abusive conduct by [Father], there will be no parenting plan."

On the issue of child support, the trial court found that Father had the ability to earn income at least at the level of the imputed income set forth in Tennessee's child support guidelines. In accordance with the Guidelines, Father was ordered to pay $721.00 per month in child support.

The trial court divided the parties' marital estate and property. As to the marital home, the trial court held:

> [Mother] shall be awarded the marital home, but [Father] shall be awarded a lien on the home of $30,000.00 to be paid upon [Son] graduating from high school or turning 18, whichever is the latter [sic] event to occur. The Court finds that the remaining equity in the home should be awarded to [Mother], whether this is called an equitable division of assets, or as alimony *in solido*. Due to this division, the Court will not require [Father] to pay any other alimony, although the Court acknowledges that she probably is in need of some alimony.

Both parties were ordered to pay their own attorney fees. From this order, Father appeals.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father asserts that the trial court erred by not adopting a permanent parenting plan giving Father some parenting time with Son. He further claims that the trial court erred in calculating the amount of Father's child support obligation by imputing income to Father. Father also asserts that the trial court erred in not awarding him a larger share of the equity in the parties' marital residence. On cross-appeal, Mother argues that the trial court erred in granting Father any portion of the equity in the marital home, and specifically in granting him a $30,000 lien on the home. Mother also asserts that the trial court should have awarded Mother attorney fees at the trial level, and seeks an award of attorney fees for this appeal.

We review the trial court's findings of fact *de novo* with no presumption of correctness unless the evidence preponderates to the contrary. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005); TENN R. APP. P. 13(d). We review the trial court's conclusions of law *de novo*, with no presumption of correctness. *Huntley v. Huntley* 61 S.W.3d 329, 334 (Tenn. Ct. App. 2001). Insofar as the trial court's findings of fact were based on its determination on the credibility of the witnesses, we accord credibility determinations by the trial court

great deference on appeal. ***See Cornelius v. Dep't of Children's Servs.***, 314 S.W.3d 902, 907 (Tenn. Ct. App. 2009).

Parenting decisions are peculiarly within the broad discretion of the trial judge. ***Suttles v. Suttles***, 748 S.W.2d 427, 429 (Tenn. 1988). The trial court's decisions on these issues are reviewed on appeal under an abuse of discretion standard. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001). This Court "will only set aside the trial court's determination if it 'falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record.' " ***Rudd v. Rudd***, No. W2009-00251-COA-R3-CV, 2009 WL 4642582, at * 4 (Tenn. Ct. App. Dec. 9, 2009) (quoting ***Eldridge***, 42 S.W.3d at 88).

Similarly, "[t]he trial court has substantial discretion when dividing the marital property, and its distribution will be given 'great weight' on appeal." ***McDaniel v. McDaniel***, No. W2007-01587-COA-R3-CV, 2008 WL 5263605, at * 6 (Tenn. Ct. App. Dec. 18, 2008). Finally, the trial court's decision on whether to award attorney fees is reviewed under an abuse of discretion standard as well. ***Richardson v. Spanos,*** 189 S.W.3d 720, 729 (Tenn. Ct. App. 2005).

## ANALYSIS

### *Father's Parenting Time*

Father asserts that the trial court erred in adopting a parenting plan that did not accord Father any parenting time. He contends that the record does not contain a finding that Father abused the child, as defined by Tennessee Code Annotated § 36-3-601(2010)[13] and asserts that any

---

[13] Under T.C.A.§ 36-3-601(1) (2010), the term "abuse" is defined as:

> [I]nflicting, or attempting to inflict, physical injury on an adult or minor by other than accidental means, placing an adult or minor in fear of physical harm, physical restraint, malicious damage to the personal property of the abused party, including inflicting, or attempting to inflict, physical injury on any animal owned, possessed, leased, kept, or held by an adult or minor, or placing an adult or minor in fear of physical harm to any animal owned, possessed, leased, kept, or held by the adult or minor[.]

T.C.A. § 36-3-601(1) (2010).

criminal charges levied against him were "unfounded" and "retired."[14] Father argues that "failing to set any contact between child and parent is tantamount to terminating a parent's rights."

In response, Mother insists that the trial court correctly denied Father any parenting time with the parties' minor child, arguing that the paramount consideration in setting parenting time is the welfare of the child. Mother contends that the trial court's specific findings of abuse by Father show that visitation would jeopardize Son's well-being. She asserts that the trial court implemented the least restrictive visitation plan that was practical under the circumstances, and gave Father an avenue for restoring the parent/child relationship.

Parenting time for a non-custodial parent is governed by Tennessee Code Annotated § 36-6-301, which states:

> After making an award of custody, the court shall, upon request of the non-custodial parent, grant such rights of visitation as will enable the child and the non-custodial parent to maintain a parent-child relationship unless the court finds, after a hearing, that visitation is likely to endanger the child's physical or emotional health . . . . If the court finds that the non-custodial parent has physically or emotionally abused the child, the court may require that visitation be supervised or prohibited until such abuse had ceased or until there is no reasonable likelihood that such abuse will recur.

Tenn. Code Ann. § 36-6-301 (2010). In reviewing a trial court's order regarding parenting time for an abuse of discretion, "the child's welfare is given 'paramount consideration.' " *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). While "the right of the noncustodial parent to reasonable visitation is clearly favored," our courts have noted that the noncustodial parent's parenting time "may be limited, or eliminated, if there is definite evidence that to permit . . . the right would jeopardize the child, in either a physical or moral sense." *Id.*, quoting *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988).

This Court takes seriously the ramifications of a parenting arrangement that precludes parenting time for the noncustodial parent. This was addressed in *Rudd v. Rudd*, No. W2009-00251-COA-R3-CV, 2009 WL 4642582 (Tenn. Ct. App. Dec. 9, 2009), in which the Court stated:

---

[14]We note that the appellate record contains no indication of the resolution of the domestic assault charges filed against Father.

Because of the legal and psychological significance of a parent's visitation rights, persons seeking to restrict or eliminate visitation must demonstrate that there is probable cause that the child will be placed at risk if visitation is permitted. The Tennessee Supreme Court requires that this proof must be "definite," *Suttles v. Suttles*, 748 S.W.2d at 429, and Tenn. Code Ann. § 36-6-30 requires that the proof demonstrate that visitation is "likely" to endanger the child's physical or emotional health. These evidentiary standards have effectively created a presumption against severely circumscribing or denying visitation to non-custodial parents. Such drastic measures are only appropriate when arrangements less detrimental to the parent-child relationship are not available or workable as a practical matter.

*Id*. at *7 (quoting *Bueno v. Todd*, No. W2005-02164-COA-R3-CV, 2006 WL 2106006 at *6 (Tenn. Ct. App. July 31, 2006); *Wix v. Wix*, No. M2000-00230-COA-R3-CV, 2001 WL 219700 at *11 (Tenn. Ct. App. Mar. 7, 2001)). The *Rudd* Court outlined the process for limiting, suspending, or terminating parenting time:

First, the trial court must make a specific finding, based on definite evidence, that visitation would cause harm to the child. *Eldridge*, 42 S.W.3d at 85. After making this finding, the trial court must then determine the least restrictive visitation plan as available and practical. *Bueno*, 2006 WL 2106006, at *6. In determining the least restrictive visitation plan, the trial court must make specific findings, based on definite evidence, that any less restrictive visitation would be harmful to the child. *Id*. The burden of proof on both the issue of harm and the least restrictive visitation plan, is on the party seeking to restrict visitation. *Id*. In making these determinations, the trial court must bear in mind that "it is the public policy of the state of Tennessee that courts *shall* grant parenting time with the non-custodial parent unless visitation will harm the child." *Kershaw v. Kershaw*, No. M2009-00151-COA-R3-CV, 2009 WL 4039262, at * 3 (Tenn. Ct. App. Nov. 20, 2009) (emphasis added).

*Rudd*, 2009 WL 4642582, at *7.

Based on this Court's careful review of the appellate record, we find that the high standard for the adoption of a parenting arrangement with no parenting time for the noncustodial parent is fully met in this case. As well described by the trial judge, the record is replete with evidence of Father's domineering and abusive conduct towards both Mother and Son, in

countless ways, large and small. Father's conduct demonstrated his belief that his role as husband and father entitled him to be the despot of the household.

Moreover, the record confirms Son's prescient testimony that Father had not "learned anything" from the eleven-month separation, weekly counseling, and attendance at an eight-week anger management course. Father's testimony was riddled with references to a worldview that the events that had occurred were merely inappropriate affronts to his "authority." Sadly, Father demonstrated no insight or self-awareness of the damage resulting from his demeanor and conduct toward Son and Mother.

We find no abuse of discretion in the trial court's order regarding Father's parenting time. Indeed, the trial court's wise order provides Father an avenue to form a relationship with Son, if it is not already damaged beyond repair. It is up to Father as to whether or not he will comply with the trial court's order. In the meantime, Father finds himself lying in the bed that he has made, and this Court will not order otherwise. The trial court's order as to the parenting arrangement is affirmed.

### *Father's Child Support Obligation*

Father asserts that the trial court erred in imputing income to him at the level set forth in the Child Support Guidelines. Father claims that his earning capacity should be set at the level of his unemployment compensation – $1300 per month. Father also contends that the trial court erred in considering his lack of parenting time, and that his child support should be reduced because Mother and Son were permitted to continue living in the marital home.

The record shows that Father freely admitted that, although he has a commercial truck driver's license, he chose not to drive overnight trips and to instead remain idle and draw unemployment compensation. Father testified as to no physical infirmities or other obstacles to actual work. We find no error in the trial court's decision to impute income to Father, in accordance with the Guidelines. Father cites no authority in support of his other arguments on child support. We find his arguments to be without merit. The trial court's award of child support is affirmed.

### *Marital Residence*

Father asserts that the trial court erred in awarding him only $30,000 of the equity in the marital residence and in granting him only a lien in that amount, to be realized when Son reaches majority. Father notes that the marital home was titled jointly, and claims that the

-14-

gifts that Mother received to pay off the mortgage were "commingled and/or transmuted into the marital residence without intent to maintain as separate property."

Father asserts that it was improper for the trial court to award the marital home to Mother solely on the grounds that doing so would give Mother a home for herself and Son, citing ***Bookout v. Bookout***, 954 S.W.2d 730 (Tenn. Ct. App. 1997). He claims that such an award to Mother is an award of "alimony *in solido*" and "is clearly unfounded and punitive in nature," and not based on Mother's need or Father's ability to pay. Father asserts that under ***Loyd v. Loyd***, 860 S.W.2d 409 (Tenn. Ct. App. 1993), an award of alimony must be based on Mother's need and Father's ability to pay.

On cross-appeal, Mother argues that the trial court erred in awarding Father any portion of the equity in the marital home. She asserts that Tennessee Code Annotated § 36-4-121(d) "encourages the court to award the family home and household effects to a spouse having physical custody of a child of the marriage," citing ***Morrow v. Morrow***, No. M2003-02448-COA-R3-CV, 2005 WL 1656825, at *4 (Tenn. Ct. App. July 14, 2005). Mother argues that the record shows that financial gifts given to Mother exclusively were used to pay off the mortgage on the marital home and to make improvements on it. In support of this assertion, Mother cites Tennessee Code Annotated § 36-4-121(c)(5)(A),[15] which states:

---

[15] Other factors to consider in making an equitable division of marital property include:

    (1) The duration of the marriage;

    (2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties

    (3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

    (4) The relative ability of each party for future acquisitions of capital assets and income,

    (6) The value of the separate property of each party;

    (7) The estate of each party at the time of the marriage;

    (8) The economic circumstances of each party at the time the division of property is to become effective;

    (9) The tax consequences to each party, costs associate with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(continued...)

> In making equitable division of marital property, the court shall consider all relevant factors, including:
>
> (5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation[16] of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role.

T.C.A. § 36-4-121(c)(5)(A) (2010). Mother argues that, while she fulfilled her role as a homemaker, Father remained underemployed or unemployed.

In the alternative, Mother argues that the trial court found that she was in need of alimony, and that Father has the ability to earn more income. She cites the observation in *Morrow*, 2005 WL 1656825, at *3, that "it would be a financial hardship for [her] to earn the necessary income to pay the lien when due, except to sell the marital residence."

In *Morrow*, cited by Mother, the parties had two minor children. *Morrow*, 2005 WL 1656825, at *1. The wife was economically disadvantaged *vis a vis* the husband, and she was awarded the marital home for herself and the minor children. *Id.* at *3. To equalize the property division, the trial court placed a lien on the home in favor of the husband, in the amount of approximately $66,000. *Id.* It declined to award alimony to the wife. *Id.* The wife appealed.

> On appeal, after reviewing the record, the appellate court in *Morrow* observed: Based on the record, we think it is highly unlikely Ms. Morrow will be able to accumulate $66,000 by the date established by the court. Her choices, then, would be to sell the house or get a mortgage on it for the amount due Mr.

---

[15](...continued)

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

T.C.A. § 36-4-121(c)(1), (2), (3), (4), (6), (7), (8), (9), (10), (11) (2010).

[16]For purposes of subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable division and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed. Tenn. Code. Ann. § 36-4-121(c)(5)(B).

Morrow. Based on her current salary, it is questionable whether she can meet her living expenses much less also pay a mortgage payment.

*Id.* at *6. Noting that "both property distribution and spousal support awards can be used to address the needs of an economically disadvantaged spouse," the ***Morrow*** court considered the trial court's decision not to award alimony, despite the wife's economic disadvantage. *Id.* To address the overall situation, the appellate court modified the property distribution to eliminate the $66,000 award to the husband and vacate the lien on the marital home. *Id.* at *10. In light of that modification, the trial court's denial of the wife's request for alimony was affirmed. *Id.*

In the case at bar, the record shows that Mother is earning to her full capacity and, as in ***Morrow***, would be unable to afford a mortgage payment. She is economically disadvantaged as compared to Father, who has a banking machine repair business and a commercial truck driver's license that lay fallow. As in ***Morrow***, Mother was awarded no alimony, despite the trial court's finding of such a need.

We agree with Father's insistence that the house is marital property. The $120,000 monetary gift from Mother's friend was deposited into a joint account and then used to pay off the mortgage, and thus was transmuted. Nevertheless, the fact that such a large portion of the equity in the home came from a gift to Mother, while not determinative, may be considered.

As in ***Morrow***, in this case, at Mother's level of income and expenses, "it is highly unlikely" that Mother will be able to accumulate the $30,000 to pay off the lien on the marital home, so when Son reaches majority, she will be forced to either sell the home or take on a mortgage payment that she cannot afford. As in ***Morrow***, we must respectfully conclude that "the legislative polices [favoring the use of property division to address economic disadvantage] are best furthered in this case by modifying the trial court's property division to eliminate" the $30,000 lien and debt in favor of Father. Accordingly, we modify the property division by revising the award to Father of $30,000 and vacate the lien placed on the marital home to secure that payment.

**Attorney Fees**

Mother asserts that she was entitled to attorney fees in the trial court, as well as on appeal. Mother asserts that she was entitled to an award of attorney fees in the trial court because she was "awarded sole physical custody of the parties' child and despite prevailing on an order of protection." Mother also notes that the trial court determined that Mother was in need of additional alimony. Mother claims that she will have to sell or liquidate her assets in order to pay her attorney fees.

Mother's point is well-taken. However, on appeal, the trial court's decision on whether to award attorney fees is reviewed under an abuse of discretion standard. ***Aaron v. Aaron***, 909 S.W.2d 408, 411 (Tenn. 1995). Reversal of the trial court's decision to deny Mother attorney fees at the trial level should occur "only when the trial court applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." ***Richardson***, 189 S.W.3d at 729 (citing ***Perry v. Perry***, 114 S.W.3d 465, 467 (Tenn. 2003); ***Clinard v. Blackwood***, 46 S.W.3d 177, 182 (Tenn. 2001)). In view of all of the circumstances, including our modification of the property division, we conclude that the trial court acted within its discretion. Therefore, we affirm the trial court's denial of Mother's request for attorney fees at the trial level.

On appeal, Mother also requests that she be awarded her attorney fees in defending this appeal. An award of appellate attorney fees is a matter that is within this Court's sound discretion. ***Archer v. Archer***, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995). In considering a request for attorney fees on appeal, we consider the ability of the party seeking the fee award to pay such fees, his or her success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case. ***Darvarmanesh v. Gharacholu***, No. M2004-00262-COA-R3-CV, 2005 WL 1684050 at *16 (Tenn. Ct. App. July 19, 2005). Considering all of the relevant factors in this case, we exercise our discretion and award Mother her reasonable attorney fees incurred in this appeal. This cause must be remanded to the trial court to determine the appropriate amount of attorney fees for this appeal.

### CONCLUSION

The trial court's division of the marital estate is modified to eliminate the $30,000 award to Father from the equity in the marital home, and the $30,000 lien on the marital home is vacated. In all other respects, the decision of the trial court is affirmed. Mother is awarded her reasonable attorney fees for this appeal.

The decision of the trial court is affirmed in part, reversed in part, as set forth above, and remanded for further proceedings consistent with this Opinion. Costs on appeal are assessed against Appellant Charles S. Winkler, and his surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE